# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 26, 2013 Session

## STATE OF TENNESSEE v. MICHAEL DAVID FIELDS

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S52741     Jon Kerry Blackwood, Judge**

---

**No. E2011-02485-CCA-R3-CD - Filed July 11, 2013**

---

A Sullivan County jury found the Defendant, Michael David Fields, guilty of reckless homicide, felony murder, especially aggravated robbery, and two counts of especially aggravated burglary. The trial court merged the reckless homicide conviction with the felony murder conviction and imposed a mandatory life sentence for felony murder. The Defendant appeals, claiming he was denied his right to a speedy trial. After a thorough review of the record and relevant law, we conclude that the trial court properly found there was no violation of the Defendant's right to a speedy trial. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Stephen M. Wallace, Blountville, Tennessee, for the appellant, Michael David Fields.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel, Criminal Justice Division; Barry P. Staubus, District Attorney General; and Teresa Ann Nelson and Amber D. Massengill, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a robbery at the Ballis Tourist Home in Kingsport, Tennessee. During the course of the robbery, three of the residents were stabbed, resulting in the death of one of the residents. A Sullivan County grand jury indicted the Defendant on October 25,

2006, for premeditated murder, felony murder, especially aggravated robbery, and two counts of especially aggravated burglary.

At the Defendant's first court appearance, on October 27, 2006, Criminal Court Judge Robert A. Montgomery recused himself because he had worked in the District Attorney General's Office at the time of these crimes. Criminal Court Judge Robert E. Cupp arraigned the Defendant on November 1, 2006, and, thereafter, the Supreme Court appointed Senior Judge Jon Kerry Blackwood to preside over the Defendant's trial, which, after several continuances, was held on October 5, 2009.

## A. Trial

At the Defendant's trial, the parties presented the following evidence: Robert Abernathy, a lieutenant with the Kingsport Police Department, testified that, on October 26, 2004, he was the on-duty road supervisor. Lieutenant Abernathy described for the jury the Ballis Tourist Home, an older house located on West Sullivan Street in Kingsport. He said that the house had been converted into multiple units where tenants rented individual rooms but shared common bathrooms and a common kitchen area. The rear of the converted house had an entryway and a sidewalk. He described a "hedge area" that separated the residence from the First Baptist Church parking lot.

Lieutenant Abernathy testified that around lunch time on October 26, 2004, he heard over his police radio a request to report to the Ballis Tourist Home. Lieutenant Abernathy was a short distance from the residence and was the first to arrive on the scene. The dispatch indicated that a suspect had exited through the rear of the building, so Lieutenant Abernathy approached the rear of the residence and entered through the back door. He said that there was a long hallway with a door to his right. He looked into the room and observed a woman's body lying on the floor and the room in disarray. He said that the woman was "covered in blood." He observed a large wound that he said he would describe as a "knife wound" on the side of the victim's neck. Lieutenant Abernathy noted there was an open "pocketbook" in the room, and he said it appeared someone had gone through it.

Lieutenant Abernathy testified that, after determining the victim was deceased, he proceeded down the hallway to check the other rooms. When he reached the kitchen area, he found two men. He described the scene as "kind of confused" and the occupants as "real excited." He recalled that someone had a cut on their hand. He continued to conduct a safety sweep of the downstairs and confirmed that the assailant had exited through the back of the residence. At this point, additional police officers arrived and Lieutenant Abernathy assisted in securing the scene.

On cross-examination, Lieutenant Abernathy testified that the victim's door was not

-2-

padlocked when he arrived. He said the door was standing open when he entered the house through the back door.

Fred Nuckles, the husband of the deceased victim found by Lieutenant Abernathy, testified that in 2004 he lived in Indiana with his wife, son, and granddaughter. Nuckles explained the circumstances that brought him and his wife to Tennessee and the Ballis Tourist Home. He said that he and his wife had custody of their granddaughter until the child's mother contested custody, and the court allowed the child's mother to move the child to Tennessee. Nuckles said that he arranged for a custody hearing in Tennessee to challenge the change of custody, and he and his wife traveled to Tennessee for the court proceedings. During this time, he and his wife rented a room in the Ballis Tourist Home.

Nuckles testified that he and his wife stayed in a room in the rear of the house right next to the back door for "about two weeks" before his wife was killed. He described a small padlock on the outside of the room door that could be used to keep people from entering the rented room. On the inside of the door was a "little slide bolt."

Nuckles testified that, around noon on October 26, 2004, he walked to a nearby restaurant. He asked Mrs. Nuckles to join him, but she declined, stating that she would eat something in the house. After returning from the restaurant, Nuckles sat on the front porch enjoying the weather and fell asleep. He said that "one of the boys that run the Ballis home" came out on the porch and sat down next to Nuckles, waking him up. Nuckles asked the man what was wrong, and the man responded that someone in the house had cut him. This startled Nuckles, so he ran inside the house and found another man with a "red streak around his neck." Nuckles said this "scared the heck out of" him, so he fled the front of the house and ran around and reentered through the back door. The door to his room was padlocked, and he stated that "the guy that'd been there" had replaced the padlock on the door before leaving. Nuckles got his keys out and opened the door to find his wife lying in a puddle of blood. Nuckles ran back out and yelled for someone to call an ambulance and police.

Nuckles described the room he and his wife shared as looking like "there was a big wrestle" that had occurred in the room. He said the victim's purse was upside down and lying on the floor. He recalled that, before the robbery, his wife had "some cash" in her wallet but not a lot. Nuckles denied having seen anyone that day that might have killed the victim.

On cross-examination, Nuckles stated that neither he nor his wife knew the Defendant. He confirmed that the padlock attached to the outside of the door was hanging on the latch but not locked when he left to go to the restaurant because the victim was still in the room. When he later returned to the room and found the victim lying in her blood, the padlock was locked.

-3-

Jack Elbell, one of the victims, testified that, in October 2004, he lived in Ballis Tourist Home where his brother also lived and served as a manager. He said that he lived in the room next to the kitchen, and his brother's room was "on the other side." Elbell said that, because of the layout of the house, you could not access the back two apartments through the front door without passing through his and his brother's private living area, so the residents of the back two rooms entered through the back door.

Elbell testified that he helped his brother with some of the management tasks. He said that the procedure for rental of the units was to provide a tenant with a padlock and key for the outside of the room door. When tenants terminated their stay, they were required to return the lock and key. Elbell said that there were "quite a few times" when the exiting tenant did not return the lock and key as required. Elbell recalled that the Nuckles stayed in room "#6," a room at the rear of the house. Elbell recalled that a man named Larry White lived in the room before the Nucklesses moved in.

Elbell testified that on October 26, 2004, he walked outside of his room and saw his brother running out of the hallway with blood all over his arm. He then saw a man holding what he believed was a butcher knife. The man approached from the back of the house and demanded money from Elbell. Elbell reached for his money, approximately $55.00, but the man cut the pocket of Elbell's pants first and took Elbell's wallet. Elbell said that the man began beating him, and he "could feel [himself] going – going out of it." The next thing Elbell remembered was waking up four or five days later in the hospital. Elbell said he was told that he had undergone four operations, three on his stomach and one on his throat. He stayed in the hospital for ten days and then was sent to rehabilitation for twenty days to learn to walk again. Elbell said that he had still not "fully recovered" from these injuries.

On cross-examination, Elbell estimated that his assailant was approximately six-foot-four and 240 or 250 pounds. Elbell agreed that he was unable to identify his assailant from photographs police showed him after the incident.

Patsy Morales testified that she had been the administrative assistant at First Baptist Church in Kingsport, Tennessee for fifteen years. She stated that the church had several video cameras positioned throughout the church, fourteen on one building and twelve on the other building. One of the cameras was positioned toward the church parking lot that was located near the Ballis Tourist Home. This camera was operational on October 26, 2004, and Morales said that she provided police officers with the video recording from that date. She additionally provided police officers with a video recording taken from the same camera on the date of November 10, 2004.

Jason Bellamy, a Kingsport Police Department lieutenant, testified that, on October 26, 2004, he was dispatched to a homicide at Ballis Tourist Home. When he arrived, police

officers had already secured the area, so Lieutenant Bellamy surveyed the perimeter looking for persons of potential involvement or potential evidence. Due to its proximity to the Ballis Tourist Home, Lieutenant Bellamy went to the First Baptist Church to inquire about any potential evidence or witnesses. As Lieutenant Bellamy spoke with several people, he learned of a video surveillance system and, ultimately, obtained video footage from October 26, 2004. Lieutenant Bellamy testified that he watched the video numerous times. Based on information obtained through several people he had interviewed and the video footage, police issued a BOLO for a vehicle. He said that he took possession of the video and turned it over to Detective David Cole.

Chris Ashbrook, a maintenance supervisor at First Baptist Church, testified that visitors to the Ballis Tourist Home commonly parked in the church parking lot. He recalled seeing one particular truck a few times in October 2004 and, specifically, "a couple of times" on the morning of October 26. He described the truck as "a darker truck with primer," "with a ladder rack on top." He estimated the truck was an older model black Toyota. He said that the driver was an unshaven white male in his 30s, weighing approximately 200 pounds with dark, bushy hair.

Angela McInturff testified that in October 2004, she was employed at First Baptist daycare in Kingsport, Tennessee. At the time of these events, McInturff drove a 1989 dark blue Celica that she parked in the parking lot that bordered the Ballis Tourist Home property. On October 26, 2004, at 8:00a.m., she parked between two parking spaces with the front of her car facing the back of the Ballis Tourist Home. At approximately 11:30 a.m., she left work briefly to pick up supplies for a craft project for the children. McInturff recalled that as she walked toward her car, she noticed someone coming through the tree line that separated the parking lot from the Ballis Tourist Home.

McInturff testified that she could not describe the man because she "had a really bad feeling" and "didn't want to make eye contact." She said that when the man reached the parking lot he began patting his pants "like he had maybe lost his keys." She described the man's vehicle as an old, black, Toyota truck. She said that there was pink Bondo over the wheel well on the back driver's side of the truck. McInturff testified that she was gone for approximately eight to ten minutes. When she returned, the man was seated in his truck. She went inside the daycare and shared her observations with a co-worker because she had "a really uneasy feeling." Within ten minutes, the daycare was placed on lock-down due to the events that occurred at the Ballis Tourist Home.

Bobby Lawson, a Kingsport Police Department officer, testified that he was familiar with the Defendant before the events of October 26, 2004. He described the Defendant's vehicle as an older model, black, Toyota pick-up truck. He said that the truck had a black rack commonly used for carrying ladders.

Officer Lawson testified that he was called in to assist on the homicide and stabbing that had occurred at Ballis Tourist Home. Officer Lawson recognized the description of the vehicle provided by police as matching the vehicle owned by the Defendant. He drove by the Defendant's address, a short distance from the Ballis Tourist Home, and the truck was not there. Officer Lawson said he checked the address a couple more times and, upon finding the vehicle parked in the driveway, radioed dispatch, and several detectives responded to the location.

Thomas Frazier testified that he lived in Kingsport, Tennessee, and had known the Defendant all his life. Frazier said that he sold the Defendant a 1993 Toyota pickup truck about six months to a year before these crimes. Frazier said that he had altered the vehicle and that the truck bed had been damaged due to a fire. Frazier identified the truck he sold the Defendant in photographs taken by police during the course of the investigation in this case.

Bridget Escow, the deputy clerk in the Sullivan County Clerk's Office, testified that she stored and maintained the records of the title and registration information for all vehicles in Sullivan County, Tennessee. Escow said that she checked for the registration of any vehicle owned by the Defendant in October 2004 and found that, on October 15, 2004, he had registered a Toyota pickup truck in his name.

Melanie Adkins, a Kingsport Police Department detective, testified that, on October 26, 2004, she reported to the Ballis Tourist Home based upon a report of a homicide and possible stabbings. At some point, she went to an address on Sewanee Avenue where the Defendant's vehicle had been located and spoke with the Defendant, who claimed he owned the Toyota truck parked in the driveway. She described the Defendant's demeanor during their interaction as "[v]ery, very jittery, jumpy."

Alpha Hamilton testified that the Defendant was her ex-husband. She said that in October 2004, she, the Defendant and her two daughters lived on Sewanee Avenue in Kingsport, Tennessee. She recalled that, at the time of these events, the Defendant drove a Toyota truck that he had purchased from Frazier.

Hamilton testified that, during the summer and fall of 2004, she worked at American Water Heaters in Johnson City, Tennessee. She said the Defendant worked sporadically with Frazier "doing roofing." Hamilton said that during the fall of 2004, she began to notice money missing. She found she would "com[e] up. . . short" when paying bills. She asked the Defendant about the missing money on multiple occasions and sometimes he would admit he had taken the money and other times he would deny it. As a result, Hamilton began keeping her money on her person at all times to prevent the Defendant from taking money.

Hamilton testified that on October 26, 2004, she left the house on Sewanee Avenue to go to work at 4:30 a.m. She left work that day at 2:30 p.m. When she arrived home, the Defendant was inside the house washing a quilt that was kept behind the seat of the truck for Hamilton's daughters to sit on when they rode in the back of the Defendant's truck. Hamilton said that, to her knowledge, the quilt had not been washed since it was first put in the Defendant's truck. She noticed that the clothes that were in the dryer in the morning when she left were sitting in a blue clothes hamper beside the dryer and were still damp. The following day, Hamilton noticed the quilt in the washing machine, so she took it out and noticed reddish-brown spots. She asked the Defendant about the stains, and he told her the reddish-brown spots were chalk stains. She said that she had not seen the quilt since that day and when she asked the Defendant where the quilt was, he told her "not to worry about it."

Hamilton testified that the Defendant's Toyota truck had blue and black Chevrolet floor mats in it. She was familiar with the floor mats because they had come from a Blazer that she had owned. She recalled that the floor mats were in the vehicle on October 26, 2004, when Detective Adkins came to their house and spoke with the Defendant. At some point after that day, she noticed the mats were no longer in the Defendant's truck, but she never asked the Defendant about the mats. She also noticed that a pair of the Defendant's jeans with a bleach spot on the left leg and a pair of white and blue tennis shoes were missing. When she asked the Defendant about these items, he told her he did not know what happened to the pants and shoes. Hamilton said that about a week after Detective Adkins had come to the house, she noticed that a butcher knife was missing from the kitchen.

Hamilton testified that, before October 26, 2004, she had taken the Defendant to the Ballis Tourist Home several times to visit his cousin, Larry White. Hamilton said she only entered the building on one occasion to help White move out of the residence. She recalled that she also drove past the First Baptist Church with the Defendant after the date of these crimes, several times, and the Defendant was looking for a camera. He told Hamilton that he "didn't think that that camera could get the parking lot."

Hamilton testified that, a few weeks after police questioned the Defendant about the murder at Ballis Tourist Home, on several occasions she and the Defendant discussed the crimes. She said that the Defendant maintained that he did not know anything about the murder. Hamilton said that, several months after the murder, she and the Defendant broke up, and she ultimately obtained a divorce. She said she also provided a statement to police the same day she and the Defendant broke up. In the statement, she told police that the Defendant had told her that if police found his DNA, they could not "do anything" because the Defendant had been to the room before to visit his cousin.

On cross-examination, Hamilton agreed that she took out an order of protection against the Defendant in January 2005. She explained that she sought the order because "at

the time [she] was afraid of [the Defendant]." She agreed that she filed a complaint against the Defendant before going to police the following day with a statement.

On recross examination, Hamilton testified that before she spoke with Detective Cole, she and the Defendant had an argument over his being questioned by police. Hamilton said that, during the argument, the Defendant told her that "if [she] run [her] mouth and put him away for the rest of his life, that [she] wouldn't have one." It was in response to this comment that Hamilton contacted police.

David Cole, a Kingsport Police Department detective, testified that he was assigned this case on October 26, 2004. He drove to the scene, which was secured at that point, and conducted a walk-through. Detective Cole identified photographs of the crime scene as fair and accurate representations of the Ballis Tourist Home on October 26, 2004. The detective then identified a bottle of Tylenol PM found in the victim's room that was sent to the Tennessee Bureau of Investigation ("TBI") crime lab for analysis. Along with the bottle of Tylenol, the victim's wallet, change purse, purse and its contents were sent to the TBI for analysis. Detective Cole identified a men's blue shirt, a white t-shirt, and a white towel collected from the kitchen of Ballis Tourist Home.

Detective Cole testified that he received and watched video surveillance footage from a camera located at First Baptist Church. Detective Cole said that police informed the Defendant of the surveillance camera on the day of these crimes when police went to the Defendant's residence and spoke with him. The detective said that police subsequently confiscated the Defendant's Toyota truck on November 9, 2004. Police processed the truck for evidence and also drove the truck back to the same parking spot at the same time of day to create a comparison with the video footage from October 26, 2004. Detective Cole then obtained the video footage from the recreation on November 10, 2004.

The State played the video footage taken on October 26, 2004, for the jury. Detective Cole noted that the Defendant's vehicle entered the church parking lot and parked behind the Ballis Tourist Home at 11:15 a.m. The video depicted a black truck entering the church parking lot and parking along a treeline. A person exited the vehicle at 11:25 a.m., walked toward the tree line, ducked down, and disappeared into the treeline. At 11:32 a.m., the individual emerged from the tree line and got back into the truck as McInturff was walking toward her vehicle. McInturff drove away and returned at 11:40 a.m. At approximately 11:43 a.m., the individual got out of the truck again and went into the treeline. The individual came out of the tree line at 11:53 a.m., got back into his truck, and drove away.

Jessica Starnes testified that the Defendant had been married to her mother, Alpha Hamilton. She testified that, in the first few days of November 2004, she and the Defendant went to the grocery store in his truck. On the way back home, the Defendant drove to the

church parking lot located behind the Ballis Tourist Home. The Defendant pointed at a camera located on the side of the church building and said, "How can that camera get me from there?"

Starnes testified about a quilt that was kept in the Defendant's truck. She said that her mother's ex-boyfriend's mother had made the quilt for her and her sister. The quilt was kept in the Defendant's truck for her and her sister to sit on when riding in the back of the Defendant's truck. She said that she had not seen the quilt since the time of these crimes. She also noticed that a butcher knife was missing from the knife block in the kitchen.

Marty Gibson testified that he met the Defendant "sometime in 2004" through Larry White. Gibson said that he visited Larry White at the Ballis Tourist Home, where White lived, on two or three occasions. Gibson recalled hearing about the murder and stabbings that had occurred at Ballis Tourist Home.

In April 2006, Gibson, White, and the Defendant worked on a welding job in Rock Springs, Wyoming, for Precipitator Service Group. Gibson said the three men shared a motel room in Wyoming during their month-long stay for work. At some point, he, the Defendant, and White lost some money. Gibson described the Defendant as "very angry" when he learned of the loss. Gibson said that the Defendant stated, "I'm going to leave my mark on this place. I've already killed one person."

Linton Perry testified that he lived in Yuma, Virginia. Perry said that in October 2004, Larry White and Brian Gillam lived next to Perry in a trailer. He said that he had worked on some of the Defendant's cars before and was acquainted with the Defendant's father and brother. Perry testified that, on the morning of October 26, 2004, he saw the Defendant, who driving his Toyota pickup, leave White's residence at about 10:00 a.m. He recalled that the Defendant returned to White's residence around 3:00 p.m. In the morning, the Defendant had worn blue jeans and a white shirt but, when he returned in the afternoon, he wore a blue shirt with "blue jean pants." Perry also noticed that the Defendant's truck had been washed and was still dripping water. Perry said that the Defendant "never washe[d] his truck" and that the truck was normally "dirty and nasty."

Shonda Perry, Perry's daughter-in-law, testified that in September 2004 she took White to the Ballis Tourist Home to look at a room for rent. White rented the room but did not stay for even a month before moving back to the trailer located next door to her father-in-law. Perry said that the Defendant and White worked together and that the Defendant would pick White up at the Ballis Tourist Home. Perry said that she frequently saw the Defendant's truck parked behind Ballis Tourist Home in the church parking lot. One day, she observed the Defendant use a key to unlock White's room.

Flint Smith testified that he met the Defendant in the summer of 2005 while both men were living at the Salvation Army in Kingsport, Tennessee. Smith said that he and the Defendant became friends and would "go places" together. On one occasion, the Defendant and Smith were walking past the Ballis Tourist Home on the way to the grocery store. Smith noticed that the Defendant became "real nervous" and began "looking around." When Smith asked the Defendant what was wrong, he told Smith that the police were looking for him as a suspect in the Ballis Tourist Home crimes. The Defendant shared a few details, including that "the lady" was "accidentally stabbed." He said that the Defendant stated, "I accidentally done that," and then said, "Well, it was an accident." Smith said that these statements scared him, so he made no further inquiries at the time.

Smith testified that, at a later date, in cooperation with police, he attempted to get the Defendant to discuss his role in the crimes but that the Defendant would not discuss it. Smith agreed that he approached police about his conversation with the Defendant after Smith was charged for unrelated crimes.

Dr. William McCormick, a Forensic Pathology Professor at the Quillen College of Medicine, testified as an expert witness in the area of forensic pathology. He said that his position required him to conduct forensic autopsies and to train pathology residents. Dr. McCormick said that he conducted the forensic autopsy on Karen Nuckles. He said that there were twenty-five separate stab and cut wounds on the victim, none of which entered the body cavities. Due to the "relative depth" of the injuries, Dr. McCormick estimated the knife used was "a fairly good-size knife." Dr. McCormick noted that one of the wounds cut through the victim's jugular veins. Dr. McCormick opined that, although one of the victim's wounds was potentially lethal, she died from a combination of wounds that caused her to bleed to death. Dr. McCormick noted that there were defensive wounds on the victim's hand where she had attempted to grab the blade of the knife.

The State announced the completion of the presentation of its case against the Defendant. The Defendant then offered the following proof in his defense: Melanie Adkins, a Kingsport Police Department detective, confirmed that she observed the Defendant's vehicle parked in his driveway on Sewanee Avenue at a little after 4:00 p.m. on October 26, 2004. She said that the car did not look wet or appear to have water dripping from it.

Margaret Roberts testified that in October 2004, she worked at Yuma Tire. She said she had known the Defendant since he was a boy. She recalled that on October 26, 2004, the Defendant came to her workplace between 1:00 p.m. and 1:30 p.m. She said she did not notice anything unusual about the Defendant. She said he came into the office, and she gave him "some change" for a drink.

Larry White testified that the Defendant was his cousin. White confirmed that he

lived in a mobile home in 2004 until September when he rented a room for three or four weeks at the Ballis Tourist Home before returning to his mobile home. He explained that he moved to Kingsport to try to find a job. White said that, while he stayed at the Ballis Tourist Home, the Defendant visited him there.

White testified that, early on the morning of October 26, 2004, the Defendant came to visit him at his trailer. At around 10:00 a.m. or 11:00 a.m., White left with another friend while the Defendant remained at White's trailer.

White testified that, in 2006, he and the Defendant worked in Wyoming. He said that he, the Defendant, and Marty Gibson shared a motel room to save money. White recalled an evening when the three men lost some money but said that he never heard the Defendant claim he had killed someone.

The State re-called Detective Cole as a rebuttal witness. Detective Cole testified that the distance between Ballis Tourist Home and White's residence in Yuma, Virginia, was 6.6 miles. Detective Cole said that he drove this route, and the drive took twelve minutes. He further noted that there were two car washes on the road between Kingsport, Tennessee, and Yuma, Virginia.

Based upon this evidence, the jury convicted the Defendant of reckless homicide, felony murder, especially aggravated burglary, especially aggravated robbery, and especially aggravated burglary. The trial court merged the reckless homicide conviction with the felony murder conviction and imposed a mandatory life sentence for the felony murder conviction. The trial court sentenced the Defendant to serve twenty years each for the especially aggravated robbery conviction and the two convictions for especially aggravated burglary. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant claims that his right to a speedy trial was violated. Specifically, he claims that the State caused intentional delay to gain a tactical advantage over the defense. The State responds that the trial court properly denied the Defendant's claim for violation of his right to a speedy trial. We agree with the State.

The Sixth Amendment to the United States Constitution and the Tennessee Constitution provides a defendant with the right to a speedy trial. U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. The purpose of the right to a speedy trial is to protect defendants from "oppressive pre-trial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992).

In *Barker v. Wingo*, 407 U.S. 514 (1972), the United States Supreme Court developed a four-prong balancing test to determine whether a defendant has been deprived of the right to a speedy trial. The four factors to be considered are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; (4) and the prejudice suffered by the defendant from the delay. *Id*. at 530. The delay must approach one year to trigger the *Barker* analysis, the line of demarcation depends on the nature of the case. *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997).

In this case, the Defendant was indicted on October 25, 2006, and the Defendant's trial began October 5, 2009. This delay warrants a further examination of the specific circumstances of this particular case in light of the remaining three *Barker* factors. We would note, however, that this factor should not weigh heavily against the State; an almost three-year delay from indictment to trial is not excessive in light of other cases. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001); *See, e.g.*, *Doggett*, 505 U.S. at 647 (six-year delay); *State v. Wood*, 924 S.W.2d 342 (Tenn. 1996) (thirteen-year delay); *State v. Ricky E. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057, at *5 (Tenn. Crim. App., at Nashville, Feb. 10, 2009) (eight-year delay), *no perm. app. filed*.

The next factor to be considered is the reason or reasons for the delay. *Barker*, 407 U.S. at 531. The reasonableness of a delay depends on the complexity and the nature of the case. *Doggett*, 505 U.S. at 652. In *State v. Wood*, our Supreme Court identified four possible reasons for delay, they include:

(1) intentional delay for tactical advantage or to harass the defendant;

(2) bureaucratic indifference or negligence;

(3) necessary delay for the fair and effective prosecution of the case; and

(4) delay agreed to or caused by the defendant.

*State v. Wood*, 924 S.W.2d 342 (Tenn. 1996). In this case, the Defendant contends that the delay was due to the State's intentional act to gain a tactical advantage over the defense. The Defendant asserts in his brief that his constitutional rights were violated "by repeated delays in the trial of this case that were sought by the State and facilitated by a disqualified Judge in order to try another criminal prosecution pending against the Defendant in the same Court." The State contends that the delays involved with this case were either necessary for the fair and effective prosecution of the Defendant's charges or caused, or acquiesced in, by the defense.

Our review of the record reveals that the Defendant was indicted on October 25, 2006,

and appeared before Judge Montgomery on October 27, 2006. At this time, the trial court advised the Defendant and his attorney that he would be unable to try the case due to his knowledge of the case through his position at the district attorney's office at the time of the crime. Judge Cupp was subsequently appointed to hear the case and arraigned the Defendant on November 1, 2006. Judge Cupp later withdrew, and our Supreme Court appointed Senior Judge Blackwood ("trial court") to preside over this case.

At the first hearing after the appointment, the trial court assessed the case and stated that a trial date needed to be set. The trial court suggested an April 2008 trial date, and the Defendant's attorney ("Counsel") responded, "Judge I have another case set in April. Probably the soonest we could - - - it would be about a year from now, maybe next June or July we could be ready." The trial court complied with Counsel's request and set a trial date for July 7, 2008.

On June 24, 2008, the State requested a continuance in the case due to another trial being delayed to July 7, 2008. Counsel voiced concern that the Defendant's charges for homicide committed in 2006 were being tried before the current case for a homicide committed in 2004. He argued that a conviction in the 2006 homicide charges could negatively impair the Defendant's ability to testify at the trial for the 2004 homicide. The State responded that it preferred to try the 2006 homicide case first, due to the complexity of the case involving two victims, but stated, "I'll do whatever the Court says and we'll try whatever order." The trial court stated that its schedule "effectively precludes the ability to try this case before the other case." To which Counsel responded, "Judge, my schedule would preclude that, too. I've got a murder case set every couple of months from now until December. I mean there's no way we could try this one in the - - - I mean I don't know if we'd have - - - I don't even know when we'd set it." The trial court set the trial date for February 2, 2009, and Counsel indicated his schedule would accommodate the trial date.

On December 9, 2008, the trial court inquired into whether the Defendant had filed a motion to have the Defendant evaluated for competency in the case involving the 2006 homicides. Counsel acknowledged the motion, and the trial court inquired whether Counsel would want to "incorporate that order into this case file and that motion and that order in this case and be bound by the findings." The trial court reasoned that, if the Defendant were found incompetent to stand trial in the 2006 homicides, he would likewise be incompetent to stand trial for the 2004 homicide. Counsel stated that he "hadn't thought about that previously" but agreed to draft an order to that effect. The trial court then reset the case for trial on July 20, 2009.

On June 15, 2009, the State moved to continue the trial because Detective Cole had to undergo surgery to remove part of his colon. Counsel did not object to the continuance on this basis.

As for the Defendant's role in the continuances, we conclude that the majority of the continuances were either caused by, or acquiesced to by, the Defendant. We find no evidence in the record to support the Defendant's assertion that the State intentionally delayed the trial of this case to gain a tactical advantage over the Defendant. The continuances granted in this case were appropriate in light of the circumstances. Because the Defendant caused or acquiesced to most of the continuances, the reason for the delay weighs against the Defendant.

A defendant's assertion of his speedy trial right, while not required, is "entitled to strong evidentiary weight." *Barker*, 407 U.S. at 531. Failure to assert the right ordinarily will make it difficult to prove that the right has been denied. *Id.* The Defendant did not assert his right to a speedy trial, and, thus, this factor weighs against the Defendant.

Finally, we consider the prejudice to the Defendant caused by the delay, in light of the interests protected by the speedy trial right. *Barker*, 407 U.S. at 532. The U.S. Supreme Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id.* The Defendant asserts that the delay impaired his defense because his father, a potential witness, died on November 8, 2008. The Defendant includes in the record his father's statement to police on October 28, 2004:

> [The Defendant] is my son and lives in Kingsport. On Tuesday October 26, 2004, [The Defendant] stopped by my trailer. He was driving his black Toyota truck and no person was with him. He does not work and has applied for disability which is approved but he has no [sic] received any checks. I don't remember the exact time he stopped by but I think it was somewhere around 12 noon. I got up about 10:15, smoked couple of cigarettes and made a pot of coffee. [The Defendant] came a few minutes later. He stayed 15 to 20 minutes and was checking to see if I needed anything from the store. He did not ask for any money. [The Defendant] said he was going home when he left. I talked with an officer that evening and told that officer the time he was at my house.

Our review of the record reveals that the prejudice in this case is minimal. Although the Defendant may have been prejudiced, to some degree, by his father's subsequent death, the statement is largely consistent with other trial testimony placing the Defendant in the Yuma area the morning of these crimes. The Defendant's father's testimony does not unequivocally negate the Defendant's presence at the Ballis Tourist Home at the time of the murders. The statement includes a vague reference to the time frame being around noon and then a more specific time frame of "a few minutes" after 10:15 for "15 to 20 minutes."

-14-

Furthermore, other evidence supporting the jury's conviction of the Defendant was presented at trial.

While the delay was sufficient to trigger a *Barker* inquiry, the Defendant has failed to establish a meritorious claim for a speedy trial violation. Accordingly, the Defendant is not entitled to relief as to this issue.

### B. Post-Recusal Involvement

The Defendant argues that Judge Montgomery, following his recusal from this case, engaged in improper communication with the judges who were subsequently assigned to the case and that this improper communication contributed to the failure of the State to provide the Defendant a speedy trial. Following our thorough review of the record, we find no evidence to support this contention. This issue is without merit.

### III. Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE